**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>KEVIN L BALL; AKA KEVIN BALL;<br>AKA KEVIN LEIGH BALL<br>MINDY SUE BALL; AKA MINDY BALL;<br>AKA MINDY S BALL;<br>FKA MINDY SUE SCHULER,<br>Debtors | CHAPTER 13<br><br>CASE NO. 5:23-bk-01281-MJC<br><br>Related to Docs. 57, 63, 64, 66<br><br>Hearing: September 3, 2026, 2:00 p.m. |

**APPLICANT'S PRE-HEARING BRIEF IN SUPPORT OF APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Date: August 31, 2026

s/ Carlo Sabatini
Carlo Sabatini, Attorney for Debtors
Bar Number PA 83831
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
Phone (570) 341-9000
Facsimile (570) 504-2769
Email ecf@bankruptcypa.com

## I. Introduction

In its Order of July 16, 2026, the Court allowed compensation of $6,976.00 — a twenty-five percent reduction from the amount requested — and invited Applicant to request another hearing "to supplement his burden by filing an appropriate motion." (Doc. 63, p. 5.) Applicant filed that motion (Doc. 64), the Court granted it, and a hearing is scheduled for September 3, 2026. (Doc. 66.) This brief supplements the record in advance of that hearing.

Applicant accepts that the burden of establishing the reasonableness of the requested fees rests with him. *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 261 (3d Cir. 1995). This brief carries that burden the only way it can be carried: with the facts of this case. Section III describes the five principal workstreams that generated the time at issue, entry by entry and result by result. Section IV addresses staffing, delegation, and the voluntary discounts already embedded in the Application. Section V responds to the comparison drawn in the Order to *In re Sciacca*. Section VI explains why the award should not be reduced below the amount that Applicant and the Chapter 13 Trustee reached by stipulation, and preserves Applicant's legal objections to the methodology of the twenty-five percent reduction.

Applicant respectfully requests that the Court amend the July 16, 2026 Order and allow compensation in the stipulated amount of $7,800.00, together with

expenses of $756.66, as set forth in the Stipulation and the amended proposed order filed with it. (Doc. 60.)

This brief is accompanied by the Declaration of Carlo Sabatini ("Sabatini Decl."), which sets out the facts Applicant would otherwise present at the September 3 hearing, together with exhibits from the *Sciacca* and *Samuel* dockets discussed in Section V. The declaration is the evidence; this brief is the argument. Unless the Court has questions, Applicant intends to rest on the Application, the declaration, and this brief.

## II. Procedural History

Debtors filed their joint Chapter 13 petition on June 11, 2023. (Doc. 1.) Their confirmed sixty-month plan pays $154,500.00 and provides a 100% dividend to general unsecured creditors. (Docs. 6, 35.)

On January 10, 2025, Applicant filed his first application for compensation, seeking $9,301.25 in fees and $756.66 in expenses for the period June 4, 2023 through June 19, 2024. (Doc. 57.) The application was interim in form but covered essentially all of the work in the case to that point: 42.6 hours, of which 21.6 were attorney hours and 21.0 were billed by two staff members at $135.00 and $150.00 per hour. The gross value of the time was $11,976.00; Applicant voluntarily wrote off $2,674.75 — 22.3% — before filing. (Sabatini Decl. ¶¶ 22–23.)

The Trustee objected, identifying specific entries in six categories. (Doc. 58.) The parties resolved the objection by stipulation: Applicant agreed to reduce his request by $1,501.25, to $7,800.00. (Doc. 60.) The Court held a hearing on February 11, 2025, and, on July 16, 2026, declined to approve the stipulated amount, instead applying a twenty-five percent reduction to the full requested fee and allowing $6,976.00. (Doc. 63.) The Order identified three categories of concern — "charges for services that are non-billable administrative tasks, paralegal or secretarial duties that should have been billed at non-attorney rates, and . . . excessive time billed for certain tasks" (Doc. 63, p. 2) — and invited Applicant to supplement his burden at a further hearing. (Doc. 63, p. 5.)

## III. The Case as It Actually Unfolded

The Order describes this as "a standard Chapter 13 case with a moderate amount of post-filing work." (Doc. 63, p. 2.) Five workstreams account for the great majority of the 42.6 hours. None of them was invented, padded, or optional.

### A. An emergency filing to stop a sheriff's sale.

Debtors met with Applicant for an initial bankruptcy evaluation on June 4, 2023. Their home was scheduled for sheriff's sale on June 15, 2023. (Sabatini Decl. ¶ 4.) Seven days later, on June 11, 2023, the case was filed — and the same day, Applicant's office faxed the Wyoming County Sheriff to stop the sale. (Sabatini Decl. ¶ 5.)

Into those seven days, the firm compressed the diligence that ordinarily occupies weeks. The compression did not reduce the work; it concentrated it. Among other things: (1) Debtors estimated less than $6,000 in general unsecured debt, plus roughly $8,000 in priority tax debt for a single year; credit reports, judgment searches, and document review showed more than $72,000 in general unsecured debt — twelve times the estimate — and nearly $27,000 in priority tax debt, which changed the economics of the entire case and required a longer conversation with the clients about what a 100% plan would cost them (Sabatini Decl. ¶ 6); (2) Mrs. Ball's vehicle loan was co-signed by her father and more than a year delinquent, requiring analysis of whether a filing would protect the vehicle at all and whether a cram-down was worthwhile — Applicant concluded it was not, because in a 100% plan it would save the clients nothing (Sabatini Decl. ¶ 7); (3) Mrs. Ball had not filed her 2020 through 2022 tax returns, a defect that had to be identified before filing and cured after it (Sabatini Decl. ¶ 8); and (4) the plan, means test, wage attachment, and schedules had to be built, checked, and explained to the clients before the filing deadline that the sheriff's sale imposed.

The Order notes that approximately fifteen hours were billed before the petition was filed. (Doc. 63, p. 1 n.1; the recorded time through June 10 was 14.0 hours, see Sabatini Decl. ¶ 9 & n.1.) For a joint case prepared in seven days under a sheriff's sale deadline, with a twelve-fold surprise in the unsecured debt, that

figure is not excessive — particularly because the majority of those hours were billed by staff at $135.00 to $150.00 per hour, not at attorney rates. The task-by-task detail of the schedule-preparation work is itemized in the five-page task breakdown attached to the bill. (Sabatini Decl. ¶ 9.)

**B. Claims administration in a 100% plan.**

Because the plan pays a 100% dividend, every dollar of allowed unsecured claims is a dollar Debtors must actually pay. Claims review in this case was therefore not clerical housekeeping; it was the single most direct way counsel could save the clients money.

Twenty-seven proofs of claim, plus amendments, were filed. Nearly all were analyzed by a staff member in increments of 0.1 or 0.2 hours. (Sabatini Decl. ¶ 10.) Where analysis showed a claim was not owed or not enforceable, Applicant sought withdrawal by email rather than by objection, at a cost to the Debtors of 0.1 hours per creditor. The Claims Register confirms that four claims — Claims 2 ($1,170.39), 5 ($894.53), 6 ($275.71), and 8 ($3,613.91) — were withdrawn: $5,954.54 that the Debtors will never have to pay through their 100% plan. (Sabatini Decl. ¶ 11.) An email that persuades a creditor to withdraw a claim in a 100% plan produces a dollar-for-dollar benefit to the debtor at a cost of $41.50. It is difficult to identify a category of work with a better benefit-to-cost ratio.

The unfiled-tax-return problem surfaced in the IRS claim, and was resolved by getting the returns filed, tracking their delivery, and corresponding with IRS personnel regarding the claim. (Sabatini Decl. ¶ 12.)

**C. The World's Foremost Bank judgment.**

A judgment in favor of World's Foremost Bank was a lien against Debtors' real estate. Before the lien could be addressed — through the plan, by motion, or by agreement — someone had to determine who actually owned the judgment. That turned out to be genuinely difficult. The judgment creditor's former counsel, reported that World's Foremost Bank (the bank behind Cabela's) had been purchased by Capital One, that the files had been recalled into Capital One's legal network, and that she had no access to them. (Sabatini Decl. ¶ 13.)

Applicant served the plan on an officer of Capital One by certified mail, then spent months attempting to get anyone at Capital One to take ownership of the judgment: calls and emails to two law firms, a motion for a Rule 2004 examination, a subpoena with a witness fee, and eventually a series of conversations with Capital One representatives who confirmed the acquisition. (Sabatini Decl. ¶ 14.) The Trustee characterized this workstream as producing no benefit to the estate. (Doc. 58, ¶ 21.C.) Respectfully, clearing a judgment lien from the Debtors' home is a benefit to the Debtors, and 11 U.S.C. § 330(a)(4)(B) directs the Court to consider exactly that: "the benefit and necessity of such services to the

debtor." The entire workstream — locating the judgment's owner, the 2004 motion, the subpoena, and the negotiations — cost approximately $947 in fees. (Sabatini Decl. ¶ 14 & n.2; Ex. H, Sched. 2.) The judgment is addressed through the second amended plan, which pays the underlying claims in full and provides for satisfaction of the lien. (Sabatini Decl. ¶ 14 n.2.)

**D. The Santander motion and the plan modifications.**

Footnote 4 of the Order asks how "a simple arrearage claim can result in, inclusive of the Motion to Modify Plan, approximately $2,401.00 in additional fees," and observes that the arrearage underlying Santander's stay-relief motion was only $3,033.24. (Doc. 63, p. 2 n.4.)

The $2,401 was not spent merely on responding to an arrearage claim. It purchased six things. *First*, an answer to Santander's motion for relief from stay — the motion that, if granted, would have cost Debtors the vehicle. (Sabatini Decl. ¶ 15.) *Second*, a negotiated resolution: Santander proposed a stipulation, and Applicant persuaded Santander's counsel that treatment through a modified plan was better — for both sides — than the stipulation Santander had drafted. (Sabatini Decl. ¶ 16, Ex. I.) Declining the stipulation route mattered: the comparable stipulation entered in *Sciacca* included a certification-of-default clause under which a relief order would enter, immediately effective, without a further hearing. (Sabatini Decl. ¶ 16 n.3, Ex. G.) *Third*, the amended plan and the motion to

modify. *Fourth*, amendments to Schedules A/B and C, including the special provision vesting Debtors' litigation claims in the Debtors. (Sabatini Decl. ¶¶ 17, 20.) *Fifth*, incorporation of the provisions concerning the amounts to be paid to Santander, NewRez, and the IRS, developed in correspondence with the Trustee's office and approved by it, which required a second amended plan. (Sabatini Decl. ¶ 18.) *Sixth*, resolution of the post-petition mortgage arrearage claim of $1,438.41 through the same modification. (Sabatini Decl. ¶ 17.)

Applicant has tallied the entries for those six items and arrives at approximately the same figure the Court did — $2,491.50 against the Court's $2,401.00 — which indicates that the figure covers all six categories, not merely the "defense" of the stay-relief motion. (Sabatini Decl. ¶ 18 & n.4; Ex. H, Sched. 3.) Applicant cannot now reconstruct how the approximately $1,700.00 estimate he gave at the February 11 Hearing was derived; perhaps it estimated the defense of the motion itself, as distinct from the modification work — the entries for the answer and the negotiations with Santander's counsel total approximately $1,004.50. (Sabatini Decl. ¶ 18 & n.5.)

The value of that work is also not measured by the size of the arrearage. The time required to respond to a stay-relief motion, negotiate with the movant's counsel, and modify a confirmed plan is essentially the same whether the arrearage is $3,000 or $13,000 — the pleadings, the calculations, and the service

requirements do not shrink with the claim. And the arrearage was not what the Debtors stood to lose. There is a difference between paying $2,400 to defend a $3,033 collection suit and paying $2,400 — through the plan, over time — to keep a vehicle when the Debtors did not have $3,033 in cash to cure the default at once. What the Debtors gained was the vehicle, a cured mortgage arrearage, and the vesting provision that later allowed their non-estate claims to be liquidated for $16,806.84 gross, of which Kevin Ball received $8,139.58 net — none of it billed to the estate. (Sabatini Decl. ¶¶ 19–20.) Measured against those outcomes, $2,401 was not excessive.

Finally, the statute directs that necessity and benefit be assessed "at the time at which the service was rendered." 11 U.S.C. § 330(a)(3)(C). When Santander's motion arrived, Applicant did not know what the resolution would ultimately cost; he knew only that his clients wanted to keep the vehicle and could not write a check for the arrears. (Sabatini Decl. ¶ 19.) Each increment of the work was reasonable when it was performed, which is the statutory test — not a retrospective comparison of the completed total against the arrearage.

As for the Trustee's observation that it might have been more efficient to resolve the stay-relief motion before filing the first motion to modify (Doc. 58, ¶ 21.B): that critique, valued by the Trustee at approximately $757.50 (Sabatini Decl. ¶ 26 n.7), was among the matters the parties resolved in the stipulation.

### E. Mortgage-servicing oversight.

The remaining significant workstream was supervision of the mortgage. The servicer's reinstatement figures did not reconcile, which prompted requests for information and a notice of error. (Sabatini Decl. ¶ 21.) More consequentially, in March 2024 Applicant compared the servicer's payment history against the Debtors' bank bill-pay transaction log and discovered that the Debtors' bill-pay account was not being funded correctly — their payments were failing without their knowledge. (Id.) Catching that error early, while it was still a small problem, is precisely the kind of unglamorous vigilance that keeps a Chapter 13 case from collapsing in year three.

## IV. Staffing, Delegation, and the Order's Three Categories

### A. Nearly half the hours were billed at staff rates.

Of the 42.6 hours recorded, 21.0 hours — 49.3% — were billed by two staff members at $135.00 and $150.00 per hour. Claims analysis, schedule preparation, document management, and routine client communications were systematically delegated. This is the staffing model the Court urged in *In re Badyrka*, 2022 WL 4656034 (Bankr. M.D. Pa. Sept. 30, 2022), and Applicant adopted it: in the Court's subsequent line-by-line review in *In re Roberson*, No. 5:22-02242-MJC (Bankr. M.D. Pa. Mar. 27, 2024), no entry was disallowed on delegation grounds. The Order here invokes the same categories — non-billable tasks, mis-rated tasks —

but does not identify any entry, and the line-by-line review that was performed in this case, the Trustee's, found $73.50 and $83.00 respectively. (Sabatini Decl. ¶ 26.)

**B. The Application was discounted before it was filed.**

The bill reflects voluntary write-offs of $2,674.75 — 22.3% of the gross time value — applied entry by entry before the Application was filed. (Sabatini Decl. ¶ 22.) Entire entries were zeroed out, including, for example, 0.4 hours of attorney research concluding that a potential FDCPA claim should not be pursued (Sabatini Decl. ¶ 20), and routine docket-review entries throughout.

The Order describes Applicant as "billing over forty (40) hours." (Doc. 63, p. 4 n.6.) The 42.6 hours is the gross recorded time — the figure that exists only because Applicant records everything and then discounts visibly, so that the Trustee and the Court can see what is not being charged. The Debtors were not billed for 42.6 hours; they were billed the net $9,301.25 — the equivalent, converting each timekeeper's write-offs to hours at that timekeeper's own rate, of 34.4 net hours: 16.1 attorney and 18.3 staff. (Sabatini Decl. ¶ 23; Ex. H, Sched. 6.) Applicant *recorded* 42.6 hours and *billed* only 34.4. An applicant who recorded less and discounted nothing would present a smaller hours figure and a larger bill. If the gross figure is held against the applicant while the discounts are disregarded, the lesson billing practitioners will draw is to stop disclosing the write-offs.

### C. The three categories in the Order, quantified against the record.

The Order rests the reduction on three categories: non-billable administrative tasks, paralegal or secretarial work billed at attorney rates, and excessive time on certain tasks. (Doc. 63, p. 2.) The Trustee's objection — the product of a genuine line-by-line review by the estate's adversarial representative — put numbers on those same categories. The entries the Trustee identified as administrative total $73.50. (Sabatini Decl. ¶ 26.) The entries identified as attorney-rate work that should have been billed at a paralegal rate total $83.00. (Id.) Every entry the Trustee identified, across all six categories of the objection, totals $3,792.00 ($4,723.50 if the entries listed in two categories are counted twice). (Sabatini Decl. ¶ 26 & n.7; Ex. H, Sched. 4.) The parties compromised those disputed items at $1,501.25 — roughly forty percent of everything the Trustee flagged. (Id. at ¶ 27.).

The twenty-five percent reduction removes $2,325.25 — $824.00 more than the stipulated reduction — without identifying a single entry beyond those the Trustee had already flagged and the parties had already resolved. If there are specific entries the Court views as non-billable, mis-rated, or excessive beyond those addressed in the stipulation, Applicant respectfully requests that they be identified at the September 3 hearing so that he can respond to them directly. That is what supplementing the burden requires: a target.

## V. The *Sciacca* Comparison

Footnote 6 of the Order compares this case to *In re Sciacca*, No. 4:25-bk-00795-MJC, where counsel "billed, at a much lower rate, a total of 17.7 hours through confirmation," and concludes that there "does not appear to be any justification for Applicant's billing over forty (40) hours." (Doc. 63, p. 4 n.6.) Applicant has reviewed the *Sciacca* record. In several respects, *Sciacca* affirmatively supports this Application.

### A. *Sciacca* involved the same billing election; the rate difference is the attorney rate, not the time.

Counsel in *Sciacca* made the same election Applicant made: hourly lodestar billing under L.B.R. 2016-2(b), at $275.00 and $135.00 per hour, rather than the Presumptively Reasonable Fee. (Sabatini Decl. ¶ 28, Ex. A.) Her application reflected 17.7 hours with a time value of $3,523.50 — approximately $199 per hour, on a bill with no write-offs. (Sabatini Decl. ¶ 29, Ex. B.) The net blended rate here — net dollars divided by net hours — is approximately $270 for the full application and approximately $237 for the work through confirmation. (Sabatini Decl. ¶ 25; Ex. H, Sched. 6.) The difference between those rates is the attorney-rate differential ($415.00 versus $275.00), a question that § 330(a)(3)(F) commits to the market — it is not a difference in attorney time: through confirmation, Applicant's net attorney time was 7.6 hours, against 7.7 recorded attorney-rate hours in *Sciacca*. (Sabatini Decl. ¶ 25.)

### B. The time windows and the cases are different.

As observed in the Order here, the *Sciacca* 17.7 hours essentially ran "through confirmation." (Order at p.4, n.6.)[1] Here, the 42.6 hours run through June 19, 2024 — nine months past confirmation — and include the Capital One judgment investigation, the Santander motion, both plan modifications, and the mortgage-servicing oversight described above. The apples-to-apples figures: through confirmation on September 21, 2023, this case recorded 27.8 total hours — 11.2 at the attorney rate and 16.6 at staff rates. (Sabatini Decl. ¶ 24.) After discounting, the net fees were $5,186.75, which equates to 21.9 net hours, of which 7.6 were attorney time. (*Id.*) The 16.8 pre-confirmation *Sciacca* hours divide the same way: approximately 7.7 hours at the $275.00 attorney rate and 9.1 hours at the $135.00 rate. (Sabatini Decl. ¶ 29, Ex. B.) The through-confirmation difference between the cases is therefore about three attorney hours and seven staff hours — for a second debtor, a seven-day emergency filing under a sheriff's sale deadline, twenty-seven claims, and an unfiled-return problem — and a total cost difference of approximately $1,663.

The procedural histories also resist comparison. Here, the original plan was confirmed 102 days after filing, without a single amendment and without objection. (Sabatini Decl. ¶ 32.) In *Sciacca*, confirmation took more than nine

[1] The last three entries on the *Sciacca* are post-confirmation and total .9 hours.

months and required three amended plans, two trustee motions to dismiss (one withdrawn as filed in error), and a trustee objection to confirmation. (Sabatini Decl. ¶ 30, Ex. D.) Those complications cut in both directions — and that is the point. If they mean *Sciacca* was not itself a routine case, then counsel's decision to bill only 17.7 hours for it reflects her own restraint, and an under-billed non-routine case is a benchmark for nothing. If *Sciacca* was routine despite the churn, then this case — with its emergency filing, its joint debtors, its twelve-fold debt surprise, and its judgment-ownership investigation — was not. Either way, the hour totals reflect what each case demanded and how each lawyer chose to bill; they do not measure whether either fee is reasonable.

### C. The approved *Sciacca* bill contains the same task types the Order treats as non-compensable here.

The *Sciacca* application — which the Court approved in full, without objection or reduction (Sabatini Decl. ¶ 30, Ex. C) — includes entries such as "ECF - Chapter 13 Petition, Statement of Social Security Number, Chapter 13 Plan, Mailing Matrix" (0.2 hours at $275.00), "ECF – 2nd Amended Chapter 13 Plan" (0.1 at $135.00), "ECF - Pre-Confirmation Certificate" (0.1 at $135.00), and "Order & Download - Credit Report" (0.1 at $135.00). (Sabatini Decl. ¶ 29, Ex. B.) These are the same electronic-filing and document-handling tasks that the Trustee's objection here valued at $73.50 (Sabatini Decl. ¶ 26) and that the Order describes as "non-billable administrative tasks." If those tasks were compensable

in *Sciacca* — at rates up to $275.00 per hour — they should be compensable here at $135.00 to $150.00.

**D. One lawyer's lower charge sets no ceiling; approved applications are the better evidence.**

Section 330(a)(3)(F) directs the Court to "the customary compensation charged by comparably skilled practitioners" — a market inquiry, and markets have ranges. A single practitioner's voluntary decision to charge less does not make it unreasonable for another to charge more for more work, any more than one discounted sale sets the market price of a house. The evidentiary asymmetry runs the other way: when a court approves an application, it necessarily finds the compensation reasonable, so an approved application is affirmative evidence of what the reasonable range includes; an unlitigated decision to charge less is evidence only of one seller's price. On that score, Applicant's own recent application in *In re Samuel*, No. 5:25-bk-00746-HWV (Bankr. M.D. Pa.) — seeking $9,279.00 for 68.8 recorded hours (11.5 attorney and 57.3 paralegal), the net equivalent of 10.8 attorney hours and 35.03 paralegal hours, at the same hourly rates billed here — drew no objection from the same Chapter 13 Trustee and was approved in full following a hearing on June 9, 2026. **Notably, the approved fees in *Samuel* include over 29 hours of paralegal time for preparing and filing the bankruptcy schedules.** (Sabatini Decl. ¶ 31, Exs. E, F.)

## VI. The Award Should Not Be Reduced Below the Stipulated Amount

### A. The stipulation was the product of the adversarial process working correctly.

The Court's Order acknowledges "the Trustee's obligation to identify improper or excessive billing entries." (Doc. 63, p. 1 n.2.) The Trustee discharged that obligation here: a twelve-page objection identifying specific entries, by date, timekeeper, rate, and amount, in six categories. The parties then negotiated a resolution that reduced the fee by $1,501.25. (Sabatini Decl. ¶ 27.) That is the adversarial process functioning exactly as designed — a specific objection, met by a specific compromise, from the party whose institutional role is to protect the estate. An award below the stipulated figure necessarily rests on concerns beyond anything the estate's own watchdog identified, and those concerns have not yet been tied to particular entries. Applicant stands ready to address any entry the Court identifies — and identification serves a second purpose: if the Court concludes that categories of work on the itemization are not compensable, Applicant can adjust his practice in future cases to stop billing for that type of work. A flat percentage reduction of 25% does not provide the information necessary to make that type of practice adjustment.

The Trustee's participation also matters to the standard of review. *Busy Beaver* grounds the bankruptcy court's independent duty to review fee applications in the concern that, in bankruptcy, no economically motivated adversary may exist

to object — and it calibrates the duty accordingly: the court "need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 844–45 (3d Cir. 1994). Here the concern that the *Busy Beaver* court identified is absent: an economically motivated fiduciary *did* scrutinize the application, line by line, and concluded that $7,800.00 was a reasonable resolution.

That conclusion bears directly on what remains for the Court to correct. An "abuse" implies something wrong — a charge that should not have been made, a rate that should not have been applied, time that should not have been spent. The Trustee is the party with the most direct knowledge of the estate's administration and of the services counsel actually performed; he is also a fiduciary who could not properly stipulate to a fee he believed excessive. When that party, after a line-by-line review, affirmatively asks the Court to award $7,800.00 (Sabatini Decl. ¶ 27), the $7,800.00 is by definition not an obviously abusive fee. A reduction below the stipulated figure therefore does not "correct" a reasonably discernible abuse; it substitutes a different judgment about an amount the estate's own watchdog has certified as reasonable — and it does so without identifying anything wrong that the Trustee missed.

### B. The 25% figure itself requires an explanation. (Preserved.)

Applicant preserves, respectfully and briefly, the objection now pending before the District Court in *In re Decantis*: a court that reduces a fee "by a particular percentage or amount (albeit for justifiable reasons) in an arbitrary or indiscriminate fashion" abuses its discretion. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 196 (3d Cir. 2000); see also *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) (district court's selection of 75% as an enhancement, rather than 50% or 10% was "essentially arbitrary"). The reasons the Order gives explain why a reduction was made; they do not explain why the reduction is 25% rather than 10%, 15%, or the 16.1% the parties stipulated to. The authority the Order cites illustrates the distinction: in *In re Nicholas*, 496 B.R. 69, 76 (Bankr. E.D.N.Y. 2011), the 40% deduction corresponded to two of the five causes of action for which fees were not recoverable — the percentage was grounded in arithmetic. No comparable arithmetic connects this record to twenty-five percent.

The indiscriminate character of a flat percentage is illustrated by the Order itself. Footnote 4 acknowledges that "additional work on disputing the claims and avoiding the lien on the Debtors' property created a benefit to the Debtors." (Doc. 63, p. 2 n.4.) Yet the 25% reduction falls on that acknowledged-benefit time with exactly the same force as on the time the Court questioned. A reduction that does

not distinguish between work the Court itself credits and work the Court doubts is, by definition, not tailored to the record.

**C. The reduction compounds discounts already given.**

The 25% was applied to the net request of $9,301.25 — a figure that already reflected $2,674.75 in voluntary write-offs. The combined effect is an allowance of $6,976.00 against gross time of $11,976.00: a total reduction of 41.75%. (Sabatini Decl. ¶ 22.) An applicant who exercises billing judgment before filing, and then compromises further with the Trustee, should not arrive at a worse result than the percentage suggests on its face. Compounding reductions in this way penalizes the exercise of billing judgment and teaches applicants to file gross bills and let the court do the trimming.

**D. The PRF cannot supply the benchmark. (Preserved.)**

The Order observes that the reduced fee "still provides Applicant with a fee in excess of the PRF." (Doc. 63, p. 4 n.6.) Applicant preserves his objection to the use of the presumptively reasonable fee as the reference point for an itemized, hourly application. L.B.R. 2016-2(c) offers counsel an election: take the PRF without itemization, or bill hourly and prove the time. When counsel makes the second election, the lodestar governs, and § 330(a)(3)(F) directs the comparison to non-bankruptcy practice — a market in which the PRF plays no role. *Busy Beaver*, 19 F.3d at 851 ("Congress has unmistakably and expressly made a policy choice

favoring full compensation for debtors' attorneys over greater proportionate compensation to the debtors' creditors."). This issue is squarely presented in the *Decantis* appeal.

Two further features of the PRF confirm that it cannot anchor the analysis. First, the Order describes the PRF, through *In re Schuman*, 2013 WL 1195279 (Bankr. N.D.N.Y. 2013), as a "pre-calculated lodestar." The presumptive fee in *Schuman* earned that description because the issuing court had actually calculated it — cataloging the services customary in a Chapter 13 case, estimating the hours, and multiplying by a reasonable rate. No comparable calculation underlies this District's PRF: the history recounted in *In re Long*, 553 B.R. 266, 268 (Bankr. M.D. Pa. 2016), describes a committee that reviewed other districts' local rules and local practices, not one that computed a lodestar.

Second, the $4,500 figure applicable to this case is a December 2020 number.[2] Adjusted for inflation, that amount corresponds to approximately $5,769 as of July 2026.[3] The current figure for a newly filed case is only $5,000.[4] A

---

[2] L.B.R 2016-2, Effective December 1, 2020, available at https://www.pamb.uscourts.gov/sites/default/files/local-rules/USBC_PAMB_Local_Rules_Dec_1_2020.pdf.
[3] https://www.bls.gov/data/inflation_calculator.htm
[4] L.B.R 2016-2, Effective October 1, 2025, available at https://www.pamb.uscourts.gov/sites/default/files/local-rules/usbc_pamb_local_rules.pdf

benchmark that was never calculated and has not kept pace with the market cannot serve as the measure of what an itemized application is worth.

### E. With a 100% plan, the reduction does not benefit any creditor.

The Order quotes *In re Pettibone Corp.* for the principle that "every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by [the] debtor." (Doc. 63, p. 3.) The creditor half of that principle has no application here: the confirmed plan pays general unsecured creditors a 100% dividend, so creditors receive every dollar they are owed whether the allowed fee is $6,976.00, $7,800.00, or $9,301.25. The only parties with an economic stake in the fee are the Debtors themselves — clients who retained Applicant under an hourly-fee agreement (Doc. 51-1, § 3.A.2.b) and have never objected to it. And counsel's incentives in this case ran in the Debtors' favor throughout: every claim withdrawal that counsel negotiated reduced what the Debtors pay, and the affirmative litigation claims counsel preserved put $8,139.58 into Kevin Ball's pocket. (Sabatini Decl. ¶ 20.)

## VII. The *Decantis* Appeal

Applicant renews, without pressing, the suggestion made in his motion: the legal questions embedded in the July 16 Order — the explanation required for a percentage reduction, and the role the PRF may play in reviewing an hourly application — are the questions now before the District Court in *In re Decantis*,

No. 3:25-cv-01927-KM (M.D. Pa.). The Court may prefer to hear the evidence on September 3 and hold decision until the appellate guidance arrives. Applicant is prepared to proceed either way.

## VIII. Conclusion

The time in this case was spent stopping a sheriff's sale on eleven days' notice, administering twenty-seven claims in a plan that pays all allowed claims in full, running a judgment's owner to ground so a lien on the Debtors' home could be addressed, defeating a stay-relief motion by negotiation, and catching a payment failure before it grew into a default. Nearly half the hours were billed at staff rates, the bill was discounted 22.3% before it was filed, and the estate's own representative — after a line-by-line review — agreed that $7,800.00 was a reasonable resolution.

Applicant respectfully requests that the Court amend its Order of July 16, 2026 (Doc. 63) to allow compensation in the amount of $7,800.00 and reimbursement of expenses in the amount of $756.66, consistent with the parties' stipulation (Doc. 60).