**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>KEVIN L BALL; AKA KEVIN BALL;<br>AKA KEVIN LEIGH BALL<br>MINDY SUE BALL; AKA MINDY BALL;<br>AKA MINDY S BALL;<br>FKA MINDY SUE SCHULER,<br>Debtors | CHAPTER 13<br><br>CASE NO. 5:23-bk-01281-MJC<br><br>Related to Docs. 57, 63, 64, 66<br><br>Hearing: September 3, 2026, 2:00 p.m. |

**DECLARATION OF CARLO SABATINI IN SUPPORT OF APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES**

I, Carlo Sabatini, pursuant to 28 U.S.C. § 1746, declare as follows:

**Background**

1. I am counsel for the Debtors and the Applicant on the *Application of Attorney for Chapter 13 Debtor for Compensation and Reimbursement of Expenses* filed January 10, 2025 (Doc. 57).

2. I submit this declaration in support of the Application and of Applicant's Pre-Hearing Brief, to present the facts I would otherwise introduce at the hearing scheduled for September 3, 2026.

3. The facts stated here are within my personal knowledge, are drawn from my firm's business records, or are drawn from the public dockets identified below.

**The emergency filing**

4. The Debtors first met with me for an initial bankruptcy evaluation on June 4, 2023. Their home was scheduled for sheriff's sale on June 15, 2023.

5. The case was filed seven days later, on June 11, 2023, and the same day my office faxed the Wyoming County Sheriff to stop the sale. (Doc. 57-2, expense entry of 6/11/2023.)

6. The Debtors estimated their general unsecured debt at less than $6,000, and priority unsecured debt of $8,000 for one tax year. Credit reports, judgment searches, and document review showed over $72,000 in general unsecured debt, and nearly $27,000 in priority unsecured debt — much more than what the Debtors had estimated. However, even with this much unsecured debt, the means test would require a 100% plan. (See Plan, Doc. 6, § 1.A.4, requiring $197,622.93 to allowed unsecured creditors.) Therefore, the variance from their initial estimates greatly changed the cost of the case to them and required additional conferences to explain it. (Doc. 57-2, entries of 6/09/2023–6/10/2023.)

7. Mrs. Ball's vehicle loan was co-signed by her father and was more than a year delinquent. I analyzed whether a filing would protect the vehicle and whether a cram-down was worthwhile. Eventually, I concluded the case would require a 100% plan, and that therefore a cram-down would not benefit them. (Doc. 57-2, entries of 6/05/2023.)

8. Mrs. Ball had not filed her 2020 through 2022 federal tax returns. That defect was identified before filing and cured after filing, and it later required work on the IRS's claim, described below.

9. Approximately 14 hours were recorded before the petition was filed.[1] The majority of those hours were staff hours billed at $135.00 to $150.00. Some of that time is reflected on entries for June 9, 2023 and June 10, 2023, which reference an "attached itemization." That task-by-task detail of the schedule-preparation work is the itemization at pages 9 through 13 of the bill. (Doc. 57-2, pp. 9–13.)

**Claims administration**

10. Twenty-seven proofs of claim, plus amendments, were filed in this case. Nearly all were analyzed by a staff member in increments of 0.1 or 0.2 hours. (Doc. 57-2, pp. 3–5.) Because the confirmed plan pays a 100% dividend, every dollar of allowed unsecured claims is a dollar the Debtors must pay, and every withdrawn or reduced claim is a dollar-for-dollar savings to them.

---

[1] Recorded time through June 10, 2023 totals 14.0 hours — 4.4 attorney hours and 9.6 staff hours — with net charges of $2,407.00. The entries dated June 11, 2023, the date of filing, total an additional 3.0 hours (2.4 attorney; 0.6 staff; $812.00 net), some of which preceded the filing, including the 1.2-hour meeting with the clients to review the petition, schedules, and plan. These figures are consistent with the Court's observation that "approximately fifteen (15) total hours [were] entered prior to the petition being filed." (Doc. 63, p. 1 n.1.) The entries are itemized in Exhibit H, Schedule 1.

11. Where analysis showed a claim might be successfully challenged, I sought withdrawal by email rather than by objection. The Court's Claims Register confirms that Claims 2 ($1,170.39), 5 ($894.53), 6 ($275.71), and 8 ($3,613.91) have all been withdrawn. Together, those withdrawals total $5,954.54 ($1,170.39 + $894.53 + $275.71 + $3,613.91) — under a plan that pays a 100% dividend, a dollar-for-dollar savings to the Debtors.

12. The unfiled-return problem surfaced in the IRS's claim. It was resolved by having the returns filed, tracking their delivery, and corresponding with IRS personnel regarding the claim. (Doc. 57-2, entries of 7/17/2023 through 8/10/2023.)

**The World's Foremost Bank judgment**

13. A judgment in favor of World's Foremost Bank was a lien against the Debtors' real estate. (Doc 1, p. 30, Schedule D, ¶ 2.9) Its former counsel reported that World's Foremost Bank had been purchased by Capital One, that the files had been recalled into Capital One's legal network, and that she had no access to them. (Doc. 57-2, entry of 8/09/2023.)

14. My office served the plan on an officer of Capital One by certified mail. However, without confirmation that Capital One succeeded to the interest of World's Foremost Bank, the service would be ineffective. Therefore, we sought to identify a Capital One representative with authority over the judgment. This

involved multiple calls and emails to two law firms, a motion for examination under Rule 2004, a subpoena with a witness fee, and eventually conversations with Capital One representatives who confirmed the acquisition. (Doc. 57-2, entries of 10/27/2023 through 2/26/2024.) I have tallied the entries for this workstream; the total is approximately $947.00 in fees.[2]

**The Santander motion and the plan modifications**

15. On March 19, 2024, Santander Consumer USA filed a motion for relief from the automatic stay concerning the Debtors' vehicle, asserting an arrearage of $3,033.24. (Doc. 42.) My office drafted and filed an answer. (Doc. 44.)

16. Santander proposed to resolve its motion by stipulation. I reviewed the proposed stipulation, concluded that treatment through a modified plan was better for the Debtors, and persuaded Santander's counsel to accept plan treatment instead. (Doc. 57-2, entries of 4/05/2024 through 4/10/2024.)[3]

---

[2] The calculations are at Exhibit H, Schedule 2. The judgment was ultimately addressed through the second amended plan, which pays the underlying claims in full and provides for satisfaction of the World's Foremost Bank lien. (Doc. 51-1, § 9.B.5.)

[3] For comparison, the stay-relief stipulation entered in *In re Sciacca* (see ¶ 28, G - below) provided that upon a default not cured within ten days of notice, "Movant shall file a Certification of Default with the Court and the Court shall enter an Order granting relief from the Automatic Stay" – that is, relief without a hearing or an opportunity to propose a cure. (*Sciacca* Doc. 41, ¶ 8; Exhibit G.) The stipulation

17. The modification work also included amendments to Schedule A/B, Schedule C, and the Plan and the resolution of a post-petition mortgage arrearage claim of $1,438.41 through the same modification (Doc. 51-1, §§ 2.C, 9.D). (Doc. 57-2, entries of 3/27/2024 through 4/26/2024; Doc. 63, p. 2.)

18. I have tallied the time entries for this workstream — the answer to the stay-relief motion, the negotiations with Santander's counsel, the two amended plans and motions to modify, the schedule amendments, and the provisions developed in correspondence with the Trustee's office and approved by it — and my tally is approximately the same as the $2,401.00 figure stated in footnote 4 of the Order.[4] Without hearing my testimony from the February 11, 2025 hearing, I

---

that Santander proposed here contained a similar provision, providing that upon a default not cured within ten days of notice, Santander "may file a Certification of Default with the Court and serve it on all interested parties, and the Court shall enter an Order granting relief from the automatic stay and co-debtor stay." (Santander's proposed stipulation, Exhibit I, ¶ 4). Resolving the Santander motion through a modified plan instead of accepting that stipulation meant that, upon any future default, Santander must proceed by motion, with notice, a hearing, and the Debtors' ability to propose a cure by stipulation or further modification. Agreeing to a stipulation might have taken less of my time, but it would have left the Debtors in a more precarious position.

[4] The tally consists of entries dated March 15, 2024 through June 12, 2024 (Doc. 57-2, pp. 6–8), with amounts net of voluntary write-offs: (a) the answer to the stay-relief motion and the negotiations with Santander's counsel — $1,004.50; (b) the amended plans, motions to modify, and amendments to Schedules A/B and C — $1,196.50; (c) communications with the Trustee's office concerning the Santander, NewRez, and IRS provisions — $207.50; and (d) the client conference of March 15, 2024 — $83.00. Total: $2,491.50. The calculations are in Exhibit H, Schedule

cannot be sure as to how I estimated the $1,700.00 figure that I provided at that time. (Doc. 63, p. 2 n.4, citing Audio of February 11 Hearing at 11:23 a.m.). Perhaps it was an estimate of the cost of defending the stay-relief motion *itself*, as distinct from the broader modification work. The entries for the answer and the negotiations with Santander's counsel total approximately $1,004.50.[5]

19. At the time this work was performed, the Debtors wished to keep the vehicle and I assume (though I do not have a note to this effect) that they did not have $3,033.24 in cash with which to cure the arrearage at once (Doc. 57-2, entries of 3/15/2024 and 4/01/2024).

20. The litigation claims (Docs. 43, 53) that vested in the Debtors through the modified plan (Docs. 51, 52), or that were later ordered abandoned (Docs. 55, 56), were subsequently liquidated for a gross recovery of $16,806.84, of which Kevin Ball received a net of $8,139.58, as disclosed in the Supplemental Disclosure Pursuant to 2016(b). (Doc. 65.) The one entry on the bill evaluating a potential FDCPA claim (6/06/2024, 0.4 hours) was written off in full. (Doc. 57-2, p. 7.)

---

3. The tally excludes the mortgage-servicing entries in the same period (see ¶ 21), the Capital One entries (see ¶ 14), and claims-review entries.

[5]See note 4, component (a); the component (a) entries are itemized in Exhibit H, Schedule 3.

**Mortgage-servicing oversight**

21. The mortgage servicer's reinstatement figures did not reconcile. (6/14/2023.) My office prepared requests for information and a notice of error. (9/25/2023, 4/17/2024, 5/08/2024.) In March 2024, I compared the servicer's payment history against the Debtors' bank bill-pay transaction log and discovered that the Debtors' bill-pay account was not being funded correctly, so that their mortgage payments were failing without their knowledge. The problem was identified and corrected. (Doc. 57-2, entries of 3/30/2024 through 4/01/2024.)[6]

**Billing figures**

22. The figures in this paragraph and the next three are taken from or computed from the itemized bill filed as Exhibit B to the Application. (Doc. 57-2.) The bill records 42.6 hours with a gross time value of $11,976.00 (in this declaration, "recorded hours" means hours as entered on the bill, before write-offs), voluntary pre-filing write-offs of $2,674.75 (22.3% of gross), net fees of $9,301.25, and expenses of $756.66.

---

[6] The choice of a request for information and notice of error, rather than an objection to the claim, was deliberate. An objection would have generated attorney's fees payable by the Debtors to my firm and could have *also* exposed the Debtors to the servicer's attorney's fees for defending its claim. On the other hand, a servicer may not charge a borrower for responding to a request for information or a notice of error, 12 C.F.R. §§ 1024.36(g)(1), 1024.35(h), and if a servicer fails to respond as required, a borrower who prevails in a civil action may recover costs and attorney's fees under RESPA, 12 U.S.C. § 2605(f)(3).

23. The 42.6 recorded hours divide as follows: 21.6 hours at my rate of $415.00; 11.8 hours at $150.00; and 9.2 hours at $135.00. Staff hours are 21.0 of the 42.6 total, or 49.3%. Expressed as net-hour equivalents — each timekeeper's net dollars divided by that timekeeper's rate — the write-offs reduce those recorded hours to 34.4 net hours billed: 16.1 attorney and 18.3 staff. (See Exhibit H, Schedule 6.)

24. Through confirmation on September 21, 2023, the case consumed 27.8 recorded hours — 11.2 at my rate and 16.6 at staff rates — with net fees of $5,186.75. The remaining 14.8 recorded hours, with net fees of $4,114.50, were incurred after confirmation, principally on the Capital One judgment, the Santander motion, the two plan modifications, and the mortgage-servicing oversight. In net terms, the through-confirmation figures are 21.9 net hours billed (7.6 attorney; 14.3 staff), and the post-confirmation figures are 12.5 net hours (8.5 attorney; 4.0 staff). (Exhibit H, Schedule 6.)

25. Dividing net dollars by net hours yields a net blended rate of approximately $270 per net hour for the full application ($9,301.25 ÷ 34.4) and approximately $237 for the work through confirmation ($5,186.75 ÷ 21.9). The corresponding pre-confirmation blended rate in *Sciacca* is approximately $199 (¶ 29 below; that bill reflects no write-offs, so its recorded and net figures are the same). The difference is attributable to the attorney-rate differential ($415.00

versus $275.00), not to attorney time: through confirmation, my net attorney time was 7.6 hours (Exhibit H, Schedule 6), against the 7.7 recorded attorney-rate hours in *Sciacca*.

**The Trustee's objection and the stipulation**

26. The Trustee's objection identified specific entries in six lettered categories, by date, description, timekeeper, rate, hours, and amount. (Doc. 58, ¶ 21.A–F.) I have tallied the identified entries: the entries identified as administrative (¶ 21.E) total $73.50; the entries identified as attorney-rate work that should have been billed at a paralegal rate (¶ 21.F) total $83.00; and all identified entries across all six categories total $3,792.50 ($4,723.50 if the entries listed in two categories are counted twice).[7]

27. The parties resolved the objection by stipulation, under which I agreed to reduce the request by $1,501.25, to $7,800.00, and the parties jointly asked the Court to enter an amended proposed order in that amount. (Doc. 60.)

---

[7] The calculations are itemized in Exhibit H, Schedule 4. By category, using the amounts as stated in the objection: ¶ 21.A (schedule and plan preparation) — $2,386.00; ¶ 21.B (plan-modification efficiency) — $757.50; ¶ 21.C (Rule 2004 examination) — $331.00; ¶ 21.D (vagueness) — $1,092.50; ¶ 21.E (administrative) — $73.50; ¶ 21.F (attorney rate) — $83.00. Sum: $4,723.50. Three of the ¶ 21.D entries duplicate entries listed in ¶ 21.A: the 6/09/23 entry ($540.00), the 6/10/23 entry ($337.50, stated in ¶ 21.D as $337.00), and the 6/11/23 entry ($54.00). Net of those duplicates, the total is $3,792.

**The *Sciacca* and *Samuel* records**

28. Exhibit A to this declaration is a true and correct copy of the Third Amended Chapter 13 Plan filed in *In re Sciacca*, No. 4:25-bk-00795-MJC (Bankr. M.D. Pa.), Doc. 43, obtained from the Court's CM/ECF system. Section 3.A.2.b of that plan reflects counsel's election to be compensated by hourly lodestar billing at $275.00 and $135.00 per hour, rather than the presumptively reasonable fee.

29. Exhibit B is a true and correct copy of the itemized time records filed in *Sciacca* as Doc. 55-2. Those records reflect 17.7 hours (5.0 billed and 12.7 unbilled) with a total time value of $3,523.50 — $199.07 per recorded hour; no write-offs appear on that bill. I have computed the division of those hours by rate: approximately 8.1 hours at the $275.00 attorney rate and approximately 9.6 hours at the $135.00 rate. Exhibit B includes, among others, the following entries: "ECF - Chapter 13 Petition, Statement of Social Security Number, Chapter 13 Plan, Mailing Matrix, & Certification of Rights & Responsibilities" (0.2 hours at $275.00); "ECF - 2nd Amended Chapter 13 Plan" (0.1 at $135.00); "ECF - Pre-Confirmation Certificate" (0.1 at $135.00); and "Order & Download - Credit Report" (0.1 at $135.00).

30. Exhibit C is a true and correct copy of the Order Approving First Application for allowance of compensation and expenses entered in *Sciacca* on March 3, 2026 (Doc. 56), and Exhibit D is a true and correct copy of the *Sciacca*

docket report. The docket reflects that no objection to the application was filed, that the scheduled hearing was canceled as unnecessary, and that confirmation in *Sciacca* occurred on January 8, 2026 — more than nine months after filing — following three amended plans, two trustee motions to dismiss (one withdrawn as filed in error), a trustee objection to confirmation later withdrawn, and a motion for relief from stay resolved by a creditor-drafted stipulation. (*Sciacca* Docs. 15, 17, 23, 24, 25, 30, 35, 41, 43, 49, 51, 53, 55, 56.)

31. Exhibit E is a true and correct copy of the application (Samuel Doc. 39), the accompanying bill (Samuel Doc. 39-2), and the order approving it (Samuel Doc. 43) in *In re Samuel*, No. 5:25-bk-00746-HWV (Bankr. M.D. Pa.). The application is my firm's own application at the same hourly rates billed here. Compensation of $9,279.00 was requested and approved. The bill reflects 68.8 recorded hours — 11.5 attorney and 57.3 paralegal — less voluntary write-offs of $3,311.50, producing net charges equivalent to 10.8 attorney hours and 35.03 paralegal hours. 41.3 of those recorded paralegal hours were for time spent "Continue Preparing Schedules. See attached itemization."[8] An additional 9.0

[8] The 21 entries with the description "Continue preparing schedules. See attached itemization." are dated January 18, 2025 through March 19, 2025 and total 41.3 recorded hours ($5,575.50 gross); $2,349.00 of that time was written off, so $3,226.50 was sought. The initial "Prepare schedules. See attached itemization." entry (1/17/25, 2.6 hours, $351.00) was written off in full. The additional 9.0 recorded hours comprise that initial preparation entry (2.6), five documentation-intake entries (0.9), the client signing meeting (1.5), and the updating, finalization,

recorded paralegal hours were spent on other work related to the preparation of the schedules and the filing of the case. The remainder of Ms. Bator's recorded time — five entries after March 20, 2025 — related to post-filing tasks, for which only $108.00 was sought.[9] A copy of the *Samuel* docket, schedules, and plan is attached as Exhibit F. The Chapter 13 Trustee — the same Trustee as in this case — filed no objection, and the application (Samuel Doc. 39) was approved by the Court (Samuel Doc. 43) following a hearing on June 9, 2026.

32. By contrast with the *Sciacca* confirmation path, the original plan in this case was confirmed on September 21, 2023 — 102 days after filing — without any amended plan and without objection. (Docs. 6, 35.)

---

and filing of the case on March 20, 2025 (4.0). The entries are itemized in Exhibit H, Schedule 5.

[9] The five entries dated after March 20, 2025 (3/31/25, 4/03/25, 4/04/25, 4/23/25, and 4/28/25) total 1.5 recorded hours and $202.50 gross, of which $94.50 was written off, so $108.00 was sought. As to the rate summary: Ms. Bator's line shows 51.8 recorded hours, a discount of $2,871.00, and net fees of $4,122.00. The discounts on her individual entries sum to exactly $2,871.00, so the summary is correct. The "21.27" appearing in the hours column of the discount is a derived figure — the dollar discount divided by her $135.00 rate ($2,871.00 ÷ $135.00 = 21.267, rounded to 21.27) — which is why it is stated in hundredths although no individual entry is. The entries are itemized in Exhibit H, Schedule 5.

**The hearing**

33. If the Court identifies specific time entries or categories of work that it views as non-compensable, misrated, or excessive, I will attempt to address each of those concerns at the hearing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2026

s/ Carlo Sabatini
Carlo Sabatini, Attorney for Debtors
Bar Number PA 83831
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
Phone (570) 341-9000
Email ecf@bankruptcypa.com

**Index of Exhibits**

Exhibit A — In re Sciacca, No. 4:25-bk-00795-MJC, Third Amended Chapter 13 Plan (Doc. 43)
Exhibit B — In re Sciacca, itemized time records (Doc. 55-2)
Exhibit C — In re Sciacca, Order Approving First Application (Doc. 56)
Exhibit D — In re Sciacca, docket report
Exhibit E — In re Samuel, No. 5:25-bk-00746-HWV, application and order
Exhibit F — In re Samuel, docket report, schedules, and Chapter 13 plan (from PACER)
Exhibit G — In re Sciacca, Stipulation in Settlement of Motion for Relief from Stay (Doc. 41)
Exhibit H — Calculation schedules (entry-level detail for the computations in this declaration and its notes)
Exhibit I — Santander Proposed Stipulation